David L. KLEPPER, Plaintiff-Appellant,

v.

**CITY OF MILFORD, KANSAS,**
Defendant-Appellee.

**and**

David L. KLEPPER, Plaintiff-Appellant,

v.

**UNITED STATES of America,**
**Defendant & Third Party**
**Plaintiff-Appellee,**

**and**

City of Milford, Kansas, Third Party
Defendant-Appellee.

Nos. 84–1029, 84–1174.

United States Court of Appeals,
Tenth Circuit.

Aug. 6, 1987.

As Amended Sept. 28, 1987.

Jerry K. Levy (Janet Jo Smith, with him on the brief), of Law Offices of Jerry K. Levy, P.A., Topeka, Kan., for plaintiff-appellant.

Howard Harper and Charles W. Harper, II, of Harper & Hornbaker, Chartered, Junction City, Kan. (Craig J. Altenhofen, with them on the brief), for defendant-appellee City of Milford, Kan.

Alleen S. Castellani, Asst. U.S. Atty. (Benjamin L. Burgess, Jr., U.S. Atty., and Russell Kaufman, Asst. U.S. Atty., and R. Dale Holmes, Asst. District Counsel, U.S. Army Corps of Engineers, on the brief), Topeka, Kan., for defendant third party plaintiff-appellee U.S.

Before LOGAN, MOORE and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

The incident on which these claims are based involves an injury resulting from a shallow-water dive off a boat docked at property owned and managed by a Kansas municipality and located at a lake owned by the United States government. Central to the case is the applicability and construction of the Kansas Recreational Use Statute, which assigns liability to owners of recreational lands only where fees are charged or where there is willful or malicious failure to guard against or warn of a dangerous condition, use, structure, or activity. The definition of "willful" under Kansas law is critical to the outcome of this consolidated appeal.

On August 5, 1978, while on weekend leave from his army duties at Ft. Riley, Kansas, twenty-five year old David Klepper went motor boating with two army friends on nearby Milford Lake. After several hours of boating, beer drinking, and intermittent swimming and fishing in deep water, the men pulled up to the small boat dock at the Milford city park. According to Klepper's two companions, as they approached the dock they had to lift the outboard motor up out of the water to keep it from dragging on the shallow bottom of the lake near the shore. They jumped out of the boat to tow it to the dock, thereafter tying it to the dock while Klepper remained in the boat. Then Klepper and one of his companions went to buy more beer at a small lakeside store. As Klepper returned to the lake shore from the store, he began to jog down the thirty-four foot boat ramp leading to the dock, apparently to attract the attention of an attractive teenage girl sunbathing in a bikini at the edge of the dock. Upon reaching the end of the dock, Klepper jumped aboard the boat and onto

the outside gunnel, appeared to lose his balance, but in any event lifted his arms over his head and dove head first into the murky water. His arms and then his head hit the bottom of the lake, and he permanently injured his neck and spinal cord. As he was being supported in the water while awaiting an ambulance, Klepper repeatedly stated "that was dumb." The injury left him with only partial use of his arms and very little use of his legs. Medically his injury is described as "incomplete quadraplegia."

The Army Corps of Engineers ("Corps") had constructed Milford Lake for purposes of flood control, and the United States government owned the land under and surrounding the lake. The Corps managed the lake and leased certain land around the lake to the State of Kansas and local governments for recreational purposes, terming the leased land "outgranted land." The City of Milford ("Milford") had leased a small area on the lake shore for the operation of a city park and had constructed the wooden 8 x 16 foot boat dock involved in this accident. The dock was attached to a wooden ramp leading from the shore, which together with the dock created a forty-two foot long, T-shaped structure at the edge of the lake. The city park contained facilities for boaters, campers, and picnickers.

Federal regulations govern the public use of water resource development projects that are administered by the Corps, such as Milford Lake. 36 C.F.R. Pt. 327 (1978). At the time of the accident, these regulations stated generally:

It is the policy of the Secretary of the Army acting through the Chief of Engineers to provide the public with safe and healthful recreational opportunities within all water resource development projects administered by the Chief of Engineers.

36 C.F.R. § 327.1(a) (1978). The regulations further provided that "[s]wimming, snorkling [sic], or scuba diving is permitted, except in those areas of the lake, reser-voir, or other body of water designated by the District Engineer and marked by the posting of appropriate signs." 36 C.F.R. § 327.5 (1978). Finally, the regulations stated that § 327 applies to outgranted lands as "a minimum regulatory requirement" but that, otherwise, "[a]pplicable laws and regulations of the State shall be deemed to apply on project lands or waters which are outgranted...." 36 C.F.R. § 327.23 (1978).

Under the terms of the lease, Milford was responsible for the maintenance of the area where Klepper was injured, but the Corps made quarterly inspections of the area and issued recommendations to the city for repairs and improvements. Swimming was prohibited at the boat dock and launching site involved in this accident, and Milford had erected a 4' x 6' sign on the shore to that effect. Located some twenty-nine feet north of the boat dock ramp, the sign stated:

Milford City Dock

Loading and Unloading Only!

No Swimming or Fishing

Whether the sign was actually in place or had been dislodged and was in the water at the time of the injury was subject to dispute.

In separate actions Klepper sought compensation for his injuries from both Milford and the U.S. government. Klepper lost both suits in district court, and the two actions were consolidated on appeal. We affirm.

PROCEDURAL BACKGROUND

A summary of the procedural developments in this case is important for an understanding of the issues raised on appeal. On November 30, 1979, Klepper filed a diversity action against Milford for its common-law negligence in failing to erect and maintain a "No Diving" sign on or near the dock. Milford answered by deny-

ing its negligence and asserting affirmative defenses of contributory negligence and assumption of risk. Several months later, Klepper sued the United States in a separate action under the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. § 1346(b), alleging that his injuries were caused by the negligence of the U.S. government in failing to enforce proper safety standards, thereby violating its own regulations.[1] As had Milford, the United States answered by denying its negligence and by asserting contributory negligence and assumption of risk, among other things. Both defendants asserted that Klepper was or should have been aware of the shallowness of the water at the end of the boat dock. They also asserted that his apparent intoxication and desire to attract the attention of a pretty girl sunbathing on the dock in a bikini had impaired his judgment or caused him to forget the shallowness of the water. The two actions were consolidated for purposes of discovery and summary judgment determinations. At various stages in the pretrial proceedings, motions for summary judgment were denied.

In late autumn of 1981, first Milford and then the United States were granted permission to amend their answers to plead the Kansas Recreational Use Statute ("RUS"), K.S.A. 58–3201 to –3207, as a defense. The Kansas RUS exempted landowners (including lessees) from liability for mere negligent failure to warn recreationists of dangerous conditions where "land," including facilities thereon and water, was made available for recreational use free of charge. Instead, liability attached only for willful or malicious failure to guard against or warn of a dangerous condition, use, structure, or activity. In response to the amended answers, Klepper then sought and was given permission to amend his complaint to allege that, in addition to ordi-

nary negligence, the willful conduct of the defendants caused his diving injuries.

Klepper moved to consolidate the two cases for trial. His motion was denied. Klepper's case against Milford was tried to a jury from November 28 through December 5, 1983. The case was tried on theories of both ordinary negligence and willful failure to warn or guard against known dangers. Midway through the trial, the judge ruled in chambers that in spite of plaintiff's various attempts to get around the Kansas RUS, the jury instructions would preclude a verdict based on any ordinary negligence attributable to Milford. Instead, the instructions would require the jury to find Milford's conduct to have been willful. At that stage of the trial he left to the attorneys a determination as to whether evidence of Klepper's alleged intoxication was relevant to Milford's defense to the charge of willful conduct. However, at the end of the trial, jury instruction no. 8 stated that "[n]egligence of the plaintiff will not prevent his recovery from the defendant when defendant's conduct is wilful." R. Vol. I at 207. The jury returned a verdict for Milford.

Two days later, on December 7, 1983, the claim against the United States was tried before the Honorable Richard D. Rogers, the same judge who presided over the jury trial. A stipulation allowed the judge to consider much of the same evidence that was introduced during the jury trial. In a careful and exhaustive review of the many arguments raised, Judge Rogers held that the United States was not liable for Klepper's injury.

On consolidated appeal of the two cases, Klepper alleges three legal errors by the district court: (1) that the judge used an incorrect standard of willfulness in both instructing the jury and in applying the RUS to his findings at the bench trial, (2) that the judge erred in not applying the

---

**1.** The United States in turn filed a third party complaint, alleging that under the terms of its

lease agreement with Milford, Milford was lia-

common-law "Good Samaritan" doctrine[2] to allow Klepper's ordinary negligence actions to be maintained against the two defendants in spite of the RUS, and (3) that the judge erred in admitting trial testimony without proper foundation or in violation of the pretrial order—testimony that referred to or was based on the results of Klepper's blood alcohol test performed upon his admission to the hospital after his diving accident. We will consider each of these allegations in turn.

## I.

The Kansas RUS, K.S.A. 58–3201 to –3207, uses verbatim the language of model legislation recommended by the Council of State Governments. The model statute was intended to encourage private landowners to make their lands available for public recreational use. *See* 24 Suggested State Legislation, The Council of State Governments, *Public Recreation on Private Lands: Limitations on Liability* (1965). Similar legislation has been enacted in nearly all of the fifty states, although in some states the RUS statute is referred to by other names, such as a landowner's liability statute or a sightseer statute. In any event, these statutes promote casual recreational use of open space by relieving landowners of the concern that they will be sued for injuries to strangers who hunt, trek, fish, and otherwise recreate on their land or water free of charge.

In promoting the model legislation, The Council of State Governments argued that unless the liability of private landowners was limited, many landowners would simply close their lands to public use and many recreational opportunities thereby would be lost to the public.[3] *Id.* Although the preamble to the model legislation indicated that concern for *private* landowners prompted the legislation, the actual language of the model legislation simply stated that its purpose was "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." *Id.*[4] While echoing this specific provision, the Kansas RUS, unlike its prototype, does not include a preamble explaining that the purpose is to protect private landowners. Instead, limited liability is simply extended to "owners of land,"[5] which includes lessees. Key provisions read as follows:

> Except as specifically recognized by or provided in K.S.A. 58–3206, an owner of

ble for any amount that Klepper might recover from the United States.

**2.** Throughout the lower court proceedings the parties referred to §§ 323 and 324A of the Restatement (Second) of Torts ("Restatement") as embodiments of the "Good Samaritan doctrine." *See* page 18 herein for the text of these sections. For comparable judicial use of the phrase, *see Jeffries v. United States,* 477 F.2d 52, 55–56 (9th Cir.1973); *Roberson v. United States,* 382 F.2d 714, 718 (9th Cir.1967). *Cf. Indian Towing Co. v. United States,* 350 U.S. 61, 64–65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955) ("it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner"). We have chosen to avoid use of the phrase "Good Samaritan doctrine" in the context of the Restatement, since it may be confused with the common use of the phrase today to refer to the statutory protection offered in most states to good Samaritans who undertake negligent rescue attempts. *See, e.g.,* Black's Law Dictionary 624 (5th ed. 1979).

**3.** Arguably, the same rationale would support limitations on the liability of government owners, who similarly could close public lands to public use if they felt their potential tort liability was too great. *See Jones v. United States,* 693 F.2d 1299 (9th Cir.1982); *Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980); *Gard v. United States,* 594 F.2d 1230 (9th Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

**4.** In some states with similar legislation, the legislature has exempted government lands from coverage under the statute. *See, e.g.,* Haw. Rev.Stat. §§ 520–1 to 520–8 (1985). In other states, notably California and Wisconsin, state courts at various levels have concluded that the *state and its political subdivisions are not covered* under the recreational use statutes of those states. *See Simpson v. United States,* 652 F.2d 831, 833 (9th Cir.1981); *see also Goodson v. City of Racine,* 61 Wis.2d 554, 213 N.W.2d 16 (1973).

**5.** Even if government owners of land were not meant to be covered by the model legislation and the Kansas RUS, it appears that the federal government would be covered under the RUS because the terms of the Federal Tort Claims Act provide that "The United States shall be

land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

Kan.Stat.Ann. § 58–3203 (1983).

Except as specifically recognized by or provided in K.S.A. 58–3206, an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby: (a) Extend any assurance that the premises are safe for any purpose.

(b) Confer upon such person the legal status of an invitee or a licensee to whom a duty of care is owed.

(c) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons.

Kan.Stat.Ann. § 58–3204 (1983).

Unless otherwise agreed in writing, the provisions of K.S.A. 58–3203 and 58–3204 shall be deemed applicable to the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes.

Kan.Stat.Ann. § 58–3205 (1983).

Nothing in this act limits in any way any liability which otherwise exists: (a) For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.

(b) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for recreational use thereof....

Kan.Stat.Ann. § 58–3206 (1983).

Klepper concedes that Milford did not charge for the recreational use of its boat dock but argues that Milford willfully failed to warn against the known danger of shallow water at the end of the dock. Specifically, Klepper alleges that (1) Milford knew of the shallow water, (2) knew that it posed a serious risk to divers, (3) knew that people swam and dove in the area of the boat dock, (4) recklessly disregarded the risk in not erecting a proper warning sign and thereby indicated a willingness to allow an injury to occur. Klepper alleges that the Corps' failure to properly supervise the safety conditions at the Milford boat dock area reflects virtually the same disregard for the consequences, the same willingness to allow injury to occur.

The standard which Klepper is urging upon the court is a construction of the term willful in the Kansas RUS that includes the concept of wanton conduct. According to Klepper, willful does not imply just an intention to cause injury but instead includes a high degree of negligence. A narrower definition of willfulness than this, according to Klepper, would virtually abolish rather than merely limit the liability of government landowners to persons using their land for recreation. Arguably this is so, because it is particularly inconceivable to suppose that a government owner of the land, in contrast to a private owner, would fail to warn of dangers with the express purpose of injuring persons who come on the land.[6]

Construction of the Kansas RUS presents an issue of first impression. In its nineteen years, neither the Kansas courts nor the federal courts have had reason to construe its meaning. Absent any construction by the Kansas Supreme Court of the term willful as used in the Kansas RUS, we must attempt to interpret and

---

liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. Therefore, presumably the federal government's liability would be the same as that of a private individual, regardless of what the intent of the RUS itself was. Neither party to the current appeal challenges such a view. *Cf. Otteson v. United States*, 622 F.2d 516 (10th Cir.1980).

6. We express no view on whether the government would ever deliberately intend injury to those coming on its land and do not base our review of willful on whether we favor or disfavor the arguably absolute immunity for governmental landowners conferred by the district court's interpretation of willful.

apply the law of Kansas as we believe its highest court would. *See City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 386 (10th Cir.1979). Our review of the district court's interpretation of willful under Kansas tort law convinces us that the judge's definition of willful was correct; Kansas tort law overwhelmingly favors a definition of willfulness as intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur.

Klepper correctly points out that under the law of a number of other states, the term willful in a recreational use statute has been interpreted to include the concept of wanton or reckless disregard for the safety of others. *See, e.g., Jones v. United States*, 693 F.2d 1299 (9th Cir.1982) (construing the law of Washington); *Rosa v. United States*, 613 F.Supp. 469 (M.D.Pa. 1985); *Davidow v. United States*, 583 F.Supp. 1170 (W.D.Pa.1984); *Stephens v. United States*, 472 F.Supp. 998 (C.D.Ill. 1979); *cf. McGruder v. Georgia Power Co.*, 126 Ga.App. 562, 191 S.E.2d 305, *rev.'d on other grounds*, 229 Ga. 811, 194 S.E.2d 440 (1972) (willfulness includes willingness to make an omission rather than inattentive, inadvertent omission; test excludes duty to inspect). The law of other states is hardly dispositive of the issue here, however.[7] In interpreting the Kansas RUS in a diversity case, it is Kansas law that controls, even where the intent of the model RUS was to bring some uniformity to statutory interpretation across the country.[8]

To review Kansas law in the context of this appeal, we turn to the contested jury instructions given by the district court at the end of the jury trial. Instruction no. 6 read as follows:

> An owner or lessor of land who either directly or indirectly invites or permits without charge any person to use its property for recreational purposes will be liable for wilful failure to guard or warn against a dangerous condition, use or structure, on its land.
>
> Thus, the duty owed by the City of Milford to David Klepper was to refrain from willfully injuring him.
>
> An act performed or a failure to act with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another is a wilful act.
>
> A "dangerous condition, use or structure" is one which creates a substantial risk of injury to a person.

R. Vol. I at 204.

In framing this instruction, the district court relied in part on the definition of willful in the Pattern Instructions of Kansas 2d ("PIK2d"), Civil, 3.03 (1977). According to the PIK2d, an act is willful if "performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another."[9] The PIK was drafted by the Kansas Judicial Council and included this Comment following 3.03: "[a]lthough the words 'wilful and wanton' are often used together, the Committee is of the opinion that wilful conduct is different than wanton conduct."

The district court thought it significant that the Kansas RUS used the phrase "willful or malicious" and not willful or wanton. To the court it apparently suggested that the term willful, in the RUS context, was

---

**7.** The cited cases, which broadly construe the term willful, involved a government defendant, as here. These cases, however, either involved statutory language different from the Kansas RUS or, unlike the case here, did not discuss state law that distinguished between willful and wanton conduct.

**8.** Uniformity has been compromised already by the debate over whether government owners of land were meant to be covered under the state versions of the model legislation. Additionally, uniformity in the federal system is necessarily limited by variations in the state legal systems that interpret uniform model legislation.

**9.** When the Kansas RUS was enacted in 1965, the definition of willful contained in PIK, Civil, was "willful conduct is conduct that is purposeful and intentional and not accidental." Contrary to Klepper's assertion, nothing in this earlier language clearly refutes the judge's ruling that wantonness is not an aspect of willful conduct according to Kansas law.

closer in meaning to the term malicious than it was to the term wanton. Additionally, the court noted that numerous Kansas tort cases distinguish between willful and wanton injury. *See, e.g., Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914, 920 (1982), *overruled on other grounds by Bowers v. Ottenad*, 240 Kan. 208, 729 P.2d 1103 (1986); *Friesen v. Chicago, Rock Island & Pac. R.R.*, 215 Kan. 316, 524 P.2d 1141, 1147 (1974); *Vaughn v. Murray*, 214 Kan. 456, 521 P.2d 262, 267 (1974); *Anderson v. White*, 210 Kan. 18, 499 P.2d 1056, 1058 (1972) (per curiam); *Duckers v. Lynch*, 204 Kan. 649, 465 P.2d 945, 948 (1970). The judge found the following language from *Vaughn v. Murray* particularly instructive:

> Proof of a willingness to injure is not necessary in establishing gross and wanton negligence. This is true because a wanton act is something more than ordinary negligence but it is something less than willful injury. To constitute wantonness the act must indicate a realization of the imminence of danger and a reckless disregard or a complete indifference or an unconcern for the probable consequences of the wrongful act.

521 P.2d at 267.

In contrast, Klepper relied heavily on the case of *Mathes v. Robinson*, 205 Kan. 402, 469 P.2d 259 (1970). Reliance on *Mathes* is misplaced, however, because although *Mathes* does intertwine the terms willful and wanton, the case is more interested in defining wanton conduct than willful conduct. *Mathes* states that one who acts wantonly is held "to have intended the natural consequences of his acts or omissions" and is treated as "guilty of willful and wanton wrong." *Id.* 469 P.2d at 262. Arguably, *Mathes* merely stands for the prop-

osition that there is an element of willfulness in the concept of wantonness, which is not the same as finding an element of wantonness in the concept of willfulness. In any event, the language of *Mathes* is something of an anomaly and has not been used in a string of recent Kansas tort cases that continue to distinguish between willful and wanton or reckless conduct. *See, e.g., Beck v. Kansas Adult Auth.*, 241 Kan. 13, 735 P.2d 222 (1987); *Gould v. Taco Bell*, 239 Kan. 564, 722 P.2d 511 (1986); *Bowman v. Doherty*, 235 Kan. 870, 686 P.2d 112 (1984); *Willard v. City of Kansas City*, 235 Kan. 655, 681 P.2d 1067 (1984); *Stevens v. Stevens*, 231 Kan. 726, 647 P.2d 1346 (1982). The language of *Bowman*, used also in *Beck*, is particularly on point: "A willful wrong involves an intentional act and intentional injury. A wanton wrong involves an intentional act but not an intentional injury; the act is intentional and purposeful, but the consequences of the act are not." *Bowman*, 686 P.2d at 118.[10]

■ Given the RUS phrase "willful failure to guard" and not "wanton failure to guard," Kansas law directs the conclusion that unless the defendants intended to injure the plaintiff or otherwise had a designed purpose or intent to do wrong, they were not guilty of willful failure to guard. Although one might quibble with the exact wording or sequence of the sentences in the judge's jury instruction, it neither misstates Kansas law nor misleads the jury. Under Kansas precedents and pattern instructions, willful failure to warn is more than mere reckless or knowing failure to warn with awareness of the possible consequences; it is a purposefully designed failure to warn with the intent to do wrong or cause injury. We affirm jury instruction no. 6 and the judge's use of the same legal

---

**10.** The *Restatement (Second) of Torts* § 500 comment f (1977) distinguishes between intentional misconduct and recklessness in a way similar to that in which the Kansas cases distinguish between willful and wanton conduct:

> Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to

cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

standard of willfulness in the bench trial. We also observe, in passing, that the jury verdict finding Milford not liable, and the judge's determination that the United States did not act willfully, were based on lack of evidence of willful intent to do wrong or cause injury, and there is no challenge to the evidentiary basis for either outcome.

Although we acknowledge that under this construction of the term "willful" in the RUS, a government owner will not be accountable for reckless disregard of the consequences of its actions or omissions, no matter how serious the governmental lapse nor how innocent the victim, we find no injustice under the facts of this case. Whether some modification in the RUS might be desirable, e.g., to tighten the accountability of the state and its political subdivisions, is a question we leave to others better suited to make such policy determinations, such as the Kansas legislature.[11]

## II.

It is well established that where a negligence claim is based on a violation of a federal statute or regulation, no claim will lie under the FTCA in the absence of some other duty under the applicable state law. In other words, the FTCA makes the United States liable for negligence only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. *See, e.g., Proud v. United States,* 723 F.2d 705 (9th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Jones v. United States,* 693 F.2d 1299 (9th Cir.1982); *Simpson v. United States,* 652 F.2d 831 (9th Cir.1981); *Ewell by & through Ewell v. United States,* 579 F.Supp. 1291, 1298 (D.Utah 1984). *See also Otteson v. United States,* 622 F.2d 516 (10th Cir.1980) (federal government entitled to protection of Colo-

rado sightseer statute and did not have an independent duty to maintain roads in the national forests for recreational use, given the purposes of the national forests). Klepper, therefore, does not contend on appeal that the federal safety regulations governing Lake Milford created a tort-law duty independent of duties imposed by state law in this case.

What Klepper does argue, however, is that since both the United States and Milford undertook to create a safe environment at the Milford city park and lake shore, they thereby assumed a common-law duty to do so with reasonable care. In that connection, Klepper invokes sections 323 and 324A of the Restatement (Second) of Torts ("Restatement"), arguing that the common law duties and liability reflected in those sections override the exemption from liability provided in the RUS and allow actions for ordinary negligence. Section 323 provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Section 324A extends the same protection to a third person for one's negligent performance of an undertaking necessary to protect the third person.

Klepper argues that both defendants waived their immunity under the RUS when they undertook to safeguard Milford city park users from harm. Klepper notes that Milford undertook to erect a warning sign near the boat dock, and the United

---

**11.** Some states have chosen to depart from the model legislation. We note, for instance, that under the Washington Recreational Use Statute, a landowner is not immune from liability when injuries are sustained "by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted." Wash.Rev.Code Ann. § 4.24.210 (Supp. 1987).

States undertook to make quarterly inspections of the Milford city park; therefore, since both accepted a duty to protect park users from harm, they should be held accountable for failure to do so with due care.

Klepper is correct in stating that the common-law doctrine of liability embodied in sections 323 and 324A has been recognized by Kansas courts in other contexts. *See Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983); *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 657 P.2d 532 (1983); *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982). Furthermore, the doctrine has been applied, in effect, against the United States in some contexts. *See, e.g., Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (despite unique governmental role of public firefighters, forest service firefighters are not immune from liability under the FTCA if private individuals would be liable under like circumstances); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (despite unique government function of operating Coast Guard lighthouse, government is not immune from liability for its negligent operation of lighthouse). The issue, however, is whether that doctrine should be recognized in the context of the RUS, an issue of first impression in Kansas.

▮ In support of his proposition Klepper relies primarily on a decision from the Illinois district court, *Stephens v. United States*, 472 F.Supp. 998 (C.D.Ill.1979). True, *Stephens* held that "by undertaking to promulgate rules and make inspections, the United States may be liable for negligence even if the Recreational Use Act was applicable." *Id.* at 1012. The judge in

*Stephens*, however, felt constrained to so hold because of a prior Illinois decision in *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769 (1964), which held an insurance carrier liable under Florida law for negligent safety inspections on a job site. Curiously, the *Stephens* judge did not attempt to differentiate between situations where liability had been limited by statute (such as under a RUS) and those where common-law third-party liability was involved, although the *Nelson* case did not preclude such an approach.[12] Instead, the *Stephens* judge felt "bound by the general rule absent an indication that the State's highest court is prepared to abandon or modify it." *Stephens*, 472 F.Supp. at 1011.

Here, the district judge did not feel so constrained by any similar Kansas rulings. We conclude that he was correct not to apply common-law liability as set out in sections 323 and 324A of the Restatement, given the fact that the Kansas cases adopting that principle are not interpreting it in light of a statute limiting liability such as is the case here. *See Ingram*, 672 P.2d 1083; *Circle Land & Cattle Corp.*, 657 P.2d 532; *Schmeck*, 651 P.2d 585.

Klepper also cites *Rosa v. United States*, 613 F.Supp. 469 (C.D.Pa.1985), where the district court found the United States negligent under the principle of section 323 of the Restatement in spite of Pennsylvania's Recreational Use Statute. In *Rosa*, however, the judge engaged in no discussion of the conflict between the exemption from liability in the Pennsylvania RUS and the imposition of liability under the Restatement, so his conclusion and reasoning is hardly persuasive. Additionally, and under particularly egregious factual circumstances, the *Rosa* judge held the United States liable on two independent grounds, unlike the situation here. In a very real sense,

---

12. In some ways the invocation of the holding in *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769 (1964), is a bit puzzling. There is language in the *Nelson* decision stating that "the common-law action of an injured workman is preserved unless there is something in the act [workmen's compensation act] which takes it away." *Id.* 199 N.E.2d at 785–86. Although *Nelson* found no such "something" in the workmen's compensation act, arguably there was language in the Illinois RUS that took it away in the *Stephens* case. The *Stephens* decision made no attempt to use *Nelson* in this way, however.

the invocation of the Restatement was gratuitous in *Rosa*.

In the present case, the district court noted that sound public policy would encourage safety inspections and warnings by owners of recreational areas and that liability under the RUS for negligent undertakings could well have the effect of discouraging warnings and inspections altogether. Alternatively, property owners might pull their lands from public use rather than face the increased risk attaching to their precautionary conduct.

We agree with the district court that there is no compulsion under Kansas law to extend sections 323 and 324A of the Restatement to the RUS context. The RUS itself is a statutory modification of the common law of torts and provides for no liability for simple negligence. Instead, it provides for liability only where conduct is willful or malicious or where consideration is given in return for use of the recreational facilities. If the Kansas legislature had wanted to provide for additional exceptions, such as liability for negligent inspections, it could have so stated. To rule otherwise would have the effect of defeating the purpose of the RUS. As the United States points out, "If a negligent, gratuitous inspection results in liability, the requirement in the RUS for the higher standard for liability, i.e., willfulness or maliciousness, has been eliminated." Brief of Defendant-Appellee United States at 20. We decline to so undermine the Kansas RUS statute.[13]

## III.

The significance of the dispute over the admission of testimony relating to Klepper's blood alcohol level at the time of his hospital admission, and over his ability to perceive a warning sign given that state of intoxication, is diminished in the context of the rulings in Sections I and II of this decision. The disputed testimony at the

trial was largely relevant to the question of Milford's negligence and Klepper's contributory negligence or assumption of the risk of injury. When the issue of Milford's ordinary negligence was taken away from the jury both by the judge's instruction on the definition of willfulness and his determination that the RUS precluded application of the Good Samaritan doctrine, so was the issue of any negligence on Klepper's part. Jury instructions nos. 6–8 make this clear. Jury instruction no. 8 specifically stated: "Negligence of the plaintiff will not prevent his recovery from the defendant when defendant's conduct is wilful." R. Vol. I at 207. Therefore, even if the testimony was admitted without proper foundation and in violation of the pretrial order, questions we need not address, any such error was harmless. Admittedly, if Klepper's behavior could be characterized as willful, which is dubious, given the Kansas tort definition of willful accepted here, it might have been used as a defense to the defendants' allegedly *willful* conduct. There is no evidence, however, that the disputed testimony was used in this fashion or that the jury or judge relied in any way on the disputed testimony in reaching their respective decisions that neither Milford nor the United States had willfully injured Klepper.

## CONCLUSION

The outcome in this case is governed by interpretation of the Kansas RUS. Finding no error in the judge's instructions or determinations of law, we AFFIRM the verdict of the jury for Milford and the judge's ruling for the United States in all respects.

---

**13.** Even had the judge invoked against the United States the common-law principle reflected in sections 323 and 324A of the Restatement, we would decline to reverse the judge's determination that under the facts of this case the United States would not be liable in any event.