NOT DESIGNATED FOR PUBLICATION

No. 127,967

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEPHANIE TUCKER MUIR,
*Appellant*,

v.

CLEVELAND UNIVERSITY-KANSAS CITY, CLEVELAND CHIROPRACTIC COLLEGE,
CLEVELAND CHIROPRACTIC COLLEGE, INC., CLEVELAND CHIROPRACTIC COLLEGE
CONDOMINIUM ASSOCIATION,
*Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; RHONDA K. MASON, judge. Oral argument held July 8, 2025. Opinion filed May 15, 2026. Affirmed.

*Joseph A. Kronawitter*, *J. Brett Milbourn*, and *Taylor P. Foye*, of Horn Aylward & Bandy, LLC, of Kansas City, Missouri, for appellant.

*Kevin D. Weakley* and *Kathryn M. O'Shea*, of Wallace Saunders, Chartered, of Overland Park, for appellees.

Before COBLE, P.J., ISHERWOOD and HURST, JJ.

ISHERWOOD, J: Stephanie Tucker Muir filed a personal injury action against Cleveland Chiropractic College after she sustained a traumatic brain injury while using a popular sledding hill located on the grounds of the college's Kansas City campus. The college ultimately moved for summary judgment and argued that under the Kansas Land and Water Recreational Areas Act (KLWRAA), K.S.A. 58-3201 et seq., specifically under the recreational use statute (RUS) contained therein under K.S.A. 58-3204, an

1

owner of land who permits the public to use such property for recreational purposes incurs no liability for any injury to such persons caused by an act or omission of the owner. The district court granted summary judgment in favor of Cleveland University-Kansas City, Cleveland Chiropractic College, Cleveland Chiropractic College, Inc., and Cleveland Chiropractic College Condominium Association (collectively, Cleveland). In so doing, the district court found that Cleveland was insulated from liability by virtue of Kansas' recreational use statute (RUS).

Tucker Muir brings this appeal contending that given the nature of her case, triable issues of material fact that called the applicability of the RUS into question remained unresolved at the time the district court entered its ruling. Thus, it was inappropriate to grant Cleveland's request for summary judgment. We have carefully analyzed Tucker Muir's claims in conjunction with the relevant KLWRAA provisions given the facts and circumstances of this case, and we are satisfied the district court arrived at the correct conclusion. The district court's decision to grant summary judgment in Cleveland's favor is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case are fairly simple. In the winter of 2021, Tucker Muir joined friends and family members for a sledding outing to the grounds of Cleveland Chiropractic College, where a hill that was a decades-long popular sledding spot stood. Unfortunately, after descending the hill, Tucker Muir collided with a fire hydrant and sustained a traumatic brain injury. She subsequently filed suit against the college and its associated entities. The history related to these proceedings is decidedly more complex.

*The preceding years*

Cleveland operates a chiropractic training school in Overland Park. The sledding spot at issue (Sledding Hill), is a long, wide, grassy hill located on the north side of the property. Cleveland was well aware that the public used the Sledding Hill in winter, as evidenced by several photographs and local news stories added as exhibits to the record. Cleveland staff did not prevent anyone from sledding, nor did they encourage sledding by invitation. They did not charge an admission price or fee of any kind for the general public to make use of their hill.

For several years, Cleveland took the precaution of situating hay bales around light posts and fire hydrants to reduce the risk of sledders colliding with them. This was Cleveland's practice for roughly 13 years at the time of Tucker Muir's accident, as it began with the first snowfall of 2008, the same year that Cleveland acquired the property. The hay bales cost Cleveland roughly $400 out of its $1.6 million facilities budget.

In 2019, Jeff Karp, then-Chief Operating Officer for Cleveland, emailed staff about the hay bales: "'Taking obvious precaution to avoid potential traumatic head injury and protect the public, such as hay bales in front of light poles and fire hydrants on the sledding hill is the right thing to do, besides helping our case in the event someone is injured.'" Dr. David Clark Beckley, then-Vice President of Campus and Alumni Relations, responded to Karp's message and stated that strategic placement of the hay bales was "'not a priority.'"

*The injury*

In the winter of 2020-2021, Cleveland did not utilize any hay bales because of the COVID-19 pandemic. Also, no one within the college's administrative tier requested that

3

the practice continue, nor was anyone on Cleveland's staff directed to distribute the hay bales.

On the day in question, Tucker Muir, her daughter, and their friends set out for Sledding Hill. Upon arrival, Tucker Muir parked at the bottom of the hill, and they all made the trek to its crown. Tucker Muir did not see any signs or notices of any kind, while en route to the top, that served to warn sledders that they were trespassing, cautioned they were sledding at their own risk, or gave any similar warning.

Tucker Muir and her friend used a tandem inflatable inner tube sled to ride down the hill while Tucker Muir held a GoPro camera to memorialize their descent. Upon reaching the bottom of the hill, they collided with a fire hydrant, and Tucker Muir severely struck her head. EMS was promptly contacted and an ambulance transported her to a nearby hospital.

*Discovery*

Tucker Muir filed a petition against Cleveland in December 2022 but amended the filing in February 2023. She did not allege, in either pleading, that she was properly considered a "trespasser" during the sledding activity and at the time of her accident.

Cleveland filed a motion to dismiss for failure to state a claim upon which relief can be granted. They asserted, in part, that they were exempt from liability under the KLWRAA, and that the facts Tucker Muir alleged or admitted in her amended petition failed to identify a reasonable avenue of relief. The motion was denied.

In preparation for trial, both parties conducted depositions with several of Cleveland's then-administrators. Dr. Beckley, the Vice President of Campus and Alumni Relations at that time, informed the parties that sledders, including his own son and

grandson, had visited the Sledding Hill nearly every year since Beckley began his tenure at the college. According to Beckley, the hill had been a popular sledding destination in the community for more than 40 years. He was not aware of anyone at Cleveland ever mentioning a pivot so as to prevent the public from sledding there any longer.

Beckley testified that although Cleveland asked sledders not to use parking spots that were reserved for those patients obtaining services from the college, he was not aware of any efforts Cleveland undertook to remove members of the public who were sledding. When asked about potential liability for sledding incidents, Beckley remarked that he viewed the hill as private property and people would choose what they wanted to do at their own risk.

Frank Haney, the Director of Facilities Management, was likewise a person of interest for the parties during their investigation. Haney advised that the previous owners of the building put signs up in select locations on the property to warn against trespassing and sledding. He asserted that the signs have "always been there, and we never bothered to take them down." Haney also explained that the locations of those signs were not arbitrary. The first "No Sledding" sign was situated between the campus building and building 8205, near the entrance to the parking lot. Two others were also posted near building 8205, and a third was erected in a gully between the evergreen trees near 108th Street. A "No Trespassing" sign was positioned on the west side of the parking lot. Photographic exhibits substantiated Haney's testimony about the placement for two of the "No Sledding" signs. But there was no signage of any kind on the Sledding Hill itself.

Haney informed the parties that on snowy days a security guard was stationed outside the health clinic for the express purpose of directing sledders to park somewhere other than the driveway and patient parking lot. He did not turn the public away nor did he caution that they were not permitted to use the Sledding Hill. Haney also readily acknowledged that he has never instructed his own children or other relatives that

sledding was prohibited on the hill. But he did offer that they had also never used the Sledding Hill because "[i]t would be a crazy thing to do" in his opinion given that "there's nothing to stop you when you get to the bottom, you can go right on out into the street." Haney asserted that new signage was posted in 2016 to caution sledders that they were engaging in the activity "At Your Own Risk." He also explained that the signs were up for only about a year before they were removed so the Cleveland logo could be added. That modification ultimately never came to fruition and the signs remained in storage.

Cleveland ultimately moved for summary judgment and argued that they (1) owed no duty to Tucker Muir under the RUS because the college made their property available to the general public for sledding free of charge; and (2) the factor contemplating a person's or entity's willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity was not applicable.

Tucker Muir countered that genuine issues of fact existed that should properly be determined by a jury, including: (1) the public availability of the Sledding Hill, which she claimed was a touchstone for whether Cleveland could claim protection under the RUS; (2) whether Cleveland acted "willfully" in failing to protect the public from known hazards on their property, or otherwise failing to warn of the known dangers posed by their property, noting that willful conduct strips a party who would otherwise fall within the statute's protective reach.

The district court determined that there was no genuine issue of material fact as to whether the college was insulated from liability by virtue of the RUS and granted Cleveland's motion for summary judgment.

Tucker Muir now timely appeals and brings her case before this court for a determination of whether the district court's decision to grant summary judgment to Cleveland rests upon a tenuous legal foundation that warrants reversal.

6

LEGAL ANALYSIS

I. *Did the district court err by finding that Cleveland enjoyed immunity under the Kansas Land and Water Recreational Area Act?*

Tucker Muir's overarching claim in this appeal is that the district court erred in awarding summary judgment to Cleveland on the basis of recreational use immunity when the college does not fall within the parameters required for application of Kansas' RUS.

> "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

"A district court may not decide disputed issues of material fact on summary judgment, even if the claims sound in equity rather than law." *Stechschulte v. Jennings*, 297 Kan. 2, Syl. ¶ 1, 298 P.3d 1083 (2013). An issue of fact is not genuine and material unless it has legal force and effect as to the controlling issue. A question of fact may be disputed but will not preclude summary judgment if it remains immaterial to the issue. In other words, if the disputed fact, however resolved, could not affect the judgment, it does not present a "genuine issue" for purposes of avoiding summary judgment. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 934, 296 P.3d 1106 (2013).

Summary judgment is rarely appropriate in negligence cases, unless the plaintiff fails to establish a prima facie case demonstrating the existence of the four elements of negligence: "existence of a duty, a breach of that duty, an injury, and proximate cause." *Montgomery v. Saleh*, 311 Kan. 649, 653, 466 P.3d 902 (2020). If a court concludes that a defendant accused of negligence did not have a duty to act in a certain manner toward the plaintiff, then a court may grant summary judgment because the existence of a duty is a question of law. *Elstun v. Spangles, Inc.*, 289 Kan. 754, 757, 217 P.3d 450 (2009).

We begin our analysis by examining the RUS, as well as applicable caselaw.

Kansas' RUS is set out under K.S.A. 58-3204 and models legislation recommended by the Council of State Governments. *Klepper v. City of Milford, Kansas*, 825 F.2d 1440, 1444 (10th Cir. 1987). The intention of the exemplar provision was to encourage private landowners to make their lands available for public recreational use. Legislation similar to Kansas' RUS was ultimately enacted in nearly all 50 states, although some designate theirs as a landowner's liability statute or a sightseer statute. In any event, they all promote the casual recreational use of open spaces by ameliorating landowners' concerns that they might be held financially liable for injuries sustained by individuals who opt to hunt, trek, fish, or engage in a multitude of other recreational activities on their land or water free of charge. 825 F.2d at 1444.

In an effort to increase momentum behind the model legislation, the Council of State Governments advocated for limitations on the liability that private landowners could be exposed to. The message being that many landowners would simply restrict their lands from public use which, in turn, would deprive the public of the opportunity to engage in various recreational activities. 825 F.2d at 1444. Although the preamble to the KLWRAA indicated that its development arose out of concern for private landowners, the actual language of the model legislation was more symbiotic. That is, it defined its objective as "'to encourage owners of land to make land and water areas available to the

public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.'" 825 F.2d at 1444. RUS provisions are properly classified as an affirmative defense. See *Olson v. Empire Dist. Elec. Co.*, 14 S.W.3d 218, 219 (Mo. Ct. App. 2000).

The following are key portions of the KLWRAA statutory framework. K.S.A. 58-3201 is the preamble that explains the objective of the Act:

"The purpose of this act is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes."

K.S.A. 58-3203 defines a landowner's duty of care as follows:

"[A]n owner of land who makes all or any part of the land available to the public for recreational purposes owes no duty of care to keep the premises, or that part of the premises so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on such premises to persons entering for such purposes. An owner of land who does take actions to keep the premises safe or to warn persons of a dangerous condition, use, structure or activity on the premises shall not be deprived of the protection which this law would provide had the owner not taken such actions or given such warning."

K.S.A. 58-3204 outlines an owner's responsibility as follows:

"[A]n owner of land who either directly or indirectly invites or permits any person to use such property, or any part of such property, for recreational purposes or an owner of nonagricultural land who either directly or indirectly invites or permits without charge any person to use such property, or any part of such property, for recreational purposes does not thereby:

"(a) Extend any assurance that the premises are safe for any purpose.

"(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

"(c) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons."

K.S.A. 58-3207 addresses certain liabilities and obligations held by the person opting to use the land:

"Nothing in this act shall be construed to: (a) Create a duty of care or ground of liability for injury to persons or property.

"(b) Relieve any person using the land of another for recreational purposes from any obligation which such person may have in the absence of this act to exercise care in his or her use of such land and in his or her activities thereon, or from the legal consequences of failure to employ such care."

With that explanatory overview firmly in place, we turn to how it appears when applied rather than as mere factors in isolation.

In August 1978, David Klepper suffered a catastrophic injury to his neck and spinal cord after diving headfirst into shallow water near the boat dock at Milford Lake. The United States government owned the land under and surrounding the lake. The Army Corps of Engineers (Corps) managed the lake and leased certain land around the lake to the State of Kansas, as well as local governments, for recreational purposes. The City of Milford (Milford) leased a small area on the lake shore for the operation of a city park and constructed the wooden boat dock involved in Klepper's accident. Under the terms of its lease, Milford was responsible for maintaining the area where Klepper was injured, but the Corps made quarterly inspections of the area and issued repair notices or

10

recommendations for improvements to the city. Swimming was prohibited at the site of Klepper's accident, and Milford had erected a sign to that effect approximately 29 feet from the boat dock ramp. 825 F.2d at 1441-42.

Several months after the accident, Klepper sued Milford and the United States government for negligence. Both defendants were later granted leave to amend their answers to plead Kansas' RUS as a defense. 825 F.2d at 1443. Klepper's case against Milford went to trial on theories of ordinary negligence and willful failure to warn or guard against known dangers. Midway through the trial, however, the judge determined that despite Klepper's determination to get out from under the Kansas RUS, he was unable to do so, and his case went forward solely on the "willful" conduct theory. The jury returned a verdict for Milford. Klepper's appeal was unsuccessful. 825 F.2d at 1450.

*Pauley v. Circleville*, 137 Ohio St. 3d 212, 998 N.E.2d 1083 (2013), bears striking contextual similarities to the matter before us. In that case, Jeremy Pauley and his friends decided to go snow sledding at a local park. Jeremy decided to switch to a different hill for his last run. Shortly after he started down the hill, he "'hit an immovable object'" and felt his body go numb. The accident left him a quadriplegic. His friend returned to the park the following day and found a railroad tie in the area of the accident.

Jeremy filed a negligence claim against the city but lost on summary judgment when the district court found the city was immune from suit under Ohio Rev. Code Ann. § 1533.181 (Ohio's RUS). 137 Ohio St. 3d at 213. On discretionary review, the Ohio Supreme Court worked through their RUS and noted that under its terms "'[n]o owner owes *any duty* to a recreational user to keep the premises safe for entry or use.' (Emphasis added.)" 137 Ohio St. 3d at 216. Thus, "'[i]f there is no duty, no liability can follow.'" 137 Ohio St. 3d at 216. The court ultimately concluded that Pauley was a recreational user as contemplated by the RUS. He entered the park, free of charge, to go sledding. Thus, the city was under no obligation and had no duty to him to ensure the premises were safe.

The city's immunity remained intact, and the decision of the lower court was affirmed. 137 Ohio St. 3d at 216; see also *Powderly v. Colgate University*, 248 A.D.2d 365, 365, 669 N.Y.S.2d 640 (1998) (University entitled to immunity under recreational use statute and thus, could not be held liable in negligence action brought by student injured when he struck stanchion while sledding on school property); *Adams v. Moose Hill Orchards, LLC*, 177 N.H. 55, 58, 336 A.3d 879 (2024) (orchard permitted sledders to use sledding hill without charge and thus had recreational use immunity in personal injury action brought by sledder who suffered a spinal cord injury while sledding on a hill at the orchard).

With greater clarity regarding the operation of the RUS, we turn back to Tucker Muir's claim. She contends that the district court erred because there were several disputed material facts embedded in the application of the RUS that rendered an award of summary judgment impermissible. As we take each of her claims in turn, we bear the following rubric in mind: Cleveland, as "an owner of nonagricultural land who either directly or indirectly invites or permits without charge any person to use such property, or any part of such property, for recreational purposes . . . does not thereby . . . incur liability for any injury to person or property caused by an act or omission of such persons." K.S.A. 58-3204(c). Or, distilling it down to state it another way, Cleveland would be immune from liability because it places no limitations upon, nor charges a fee for, the general public to utilize a hill located on its property for recreational enjoyment.

A. *Cleveland permitted the public to use the Sledding Hill.*

To resolve the question of whether the RUS was applicable here, it was incumbent upon the district court to first determine if there was a material dispute over whether Cleveland opened its grounds to the public. Tucker Muir contends that Cleveland is foreclosed from claiming the benefit of immunity because it erected barriers to the public's access in contravention of the policy underlying the RUS. Cleveland counters

12

Tucker Muir's claims by noting that while it had signs warning the public away from other particularized areas of its property, and employed a security guard on occasion to ensure the public avoided that area of the campus, Cleveland did not limit the public from accessing and making unfettered use of the Sledding Hill.

The record establishes that Cleveland employed security guards to ensure the public did not access some building entries and parking lots but did not prohibit their entry to the Sledding Hill itself. These actions are in line with the presence of the "No Trespassing" and "No Sledding" signs in particularized locations. The area that the public used for sledding for over four decades, and the same area where Tucker Muir's injury occurred, was not among those locations.

Tucker Muir urges us to conclude that the presence of "No Trespassing" signs foreclosed Cleveland from securing protection under a recreational use statute. For support she directs our attention to *Crawford v. Tilley*, 780 P.2d 1248 (Utah 1989), and *Gibson v. Keith*, 492 A.2d 241 (Del. 1985). But neither of these cases involved signs. Both *Crawford* and *Gibson* cite the same case involving a sign, *Georgia Power Co. v. McGruder*, 229 Ga. 811, 194 S.E.2d 440 (1972), which Tucker Muir also uses to press her position.

None of these authorities, however, can overcome what is expressly permitted by K.S.A. 58-3203, which provides:

> "[A]n owner of land who makes all *or any part* of the land available to the public for recreational purposes owes no duty of care to keep the premises, *or that part of the premises so made available*, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on such premises to persons entering for such purposes. *An owner of land who does take actions to keep the premises safe or to warn persons* of a dangerous condition, use, structure or activity on

13

the premises *shall not be deprived of the protection which this law would provide had the owner not taken such actions or given such warning*." (Emphases added.)

Finally, and perhaps the most compelling key to our resolution of this claim, is the fact that Tucker Muir alleged in her amended petition that the Sledding Hill was open to the public and Cleveland was aware of the activity. Cleveland admitted the same in its answer to that amended filing and the evidence substantiates that right of public access. Those two factors undermine Tucker Muir's contention that the public's right of access to the hill remained a disputed material fact.

Yet, in opposing summary judgment, Tucker Muir labeled as controverted the very fact that she alleged in her amended petition. And on appeal, she is essentially arguing that Cleveland did not open its private property to the public and therefore is not immune from liability under the RUA.

Tucker Muir addressed this with the district court through an argument that "[a]llegations in Plaintiff's Petition are not binding, do not 'govern the entire course of the case,' are not 'admissible in evidence' and thus, cannot support summary judgment." She provided legal citations, but they did not support her propositions and were properly rejected by the district court. For example, Tucker Muir directed the district court to *Rector v. Tatham*, 287 Kan. 230, 232, 196 P.3d 364 (2008). While that case does indeed advise that "[u]nder Kansas' notice pleading, the petition is not intended to govern the entire course of the case. Rather, the ultimate decision as to the legal issues and theories on which the case will be decided is the pretrial order." 287 Kan. at 232. But *Rector* was not a summary judgment case. The district court granted a motion to dismiss, and Mary Rector appealed. The *Rector* court then remanded the case to the district court because the facts of the case were never fully developed. 287 Kan. at 236. It was not an instance where, as here, at the conclusion of discovery, the plaintiff decided to pivot and controvert the facts that she alleged in her own petition.

Tucker Muir also cited *John Doe v. M.J.*, 59 Kan. App. 2d 273, 293, 482 P.3d 596 (2021). *John Doe* helps to illustrate the rule and explains why Tucker Muir's claims are an exception. In that case, plaintiff H.B. alleged that M.J. sexually abused him for a period when he was between the ages of 9 and 12 years old and between his fourth- and seventh-grade years. Based on these approximations, M.J. asserted that the alleged abuse would have ended in April 1984 (when H.B. turned 13) or May 1984 (at the end of H.B.'s seventh-grade year). That timeline was altered slightly during H.B.'s deposition. 59 Kan. App. 2d at 293. The shift in H.B.'s case was a relatively minor adjustment to a timeline, not a complete reversal of his theory of the case. The *John Doe v. M.J.* court allowed it, and our Supreme Court affirmed on review. *John Doe v. M.J.*, 315 Kan. 310, 318, 508 P.3d 368 (2022).

None of the citations Tucker Muir favors us with stand for the proposition that a plaintiff may controvert or directly contradict their own earlier assertions after they have been established by the record as accurate. The district court did not err by accepting as true the fact which Tucker Muir successfully pleaded and proved.

B. *Hay bales*

Tucker Muir next asserts that Cleveland's use of hay bales constituted a contested issue of material fact but for the district court's impermissible resolution of the matter in Cleveland's favor. But Tucker Muir's argument is not clearly defined for two reasons. First, she argues that the testimony received by the district court on this issue neglected to make any mention of the COVID-19 pandemic as a basis for Cleveland's discontinuation of the practice. Yet, the transcript available to us in the appellate record reflects that the testimony contained specific references to COVID-19.

In its summary judgment motion, Cleveland asserted that the hay bales were not placed due to COVID-19, and directed the reader back to Haney's deposition to

15

substantiate its claim. Tucker Muir told the district court and argues to this court that the testimony cited does not support the asserted fact. Specifically, she contends: "[T]he deposition testimony cited by the Cleveland Defendants in support of that fact literally says nothing about COVID-19 being the reason why the Cleveland Defendants failed to deploy hay bales around dangerous conditions on the sledding hill." This claim is expressly contradicted by the record. When asked how he determined whether or not to put down the hay bales, Haney offered the following unequivocal response: "Well, if I have to think back, in 2020 and 2021 I believe it was because of COVID we did not put any hay bales out there because we didn't think people would come out there, but they did."

The second flaw in Tucker Muir's argument is that the reason for the absence of the hay bales—be it COVID-19 or some other justification—was immaterial to the district court's ruling. The hay bales were not there and, as a result, Tucker Muir collided directly with a fire hydrant. The parties do not dispute the material fact that the hay bales were absent, but Tucker Muir does not present an argument to establish that the reason for their absence is also a material fact. That is, it would not matter to the judgment whether the hay bales were absent due to COVID-19 or for some other reason. The district court determined that Cleveland had no duty to place hay bales around the fire hydrant.

C. *Charging admission*

Tucker Muir next disputes the district court's adoption of fact No. 4 in Cleveland's motion for summary judgment as uncontroverted. That fact alleged: "The Cleveland Defendants . . . did not charge any admission for people to sled on the Sledding Hill."

While Tucker Muir alleged in her amended petition that Cleveland did nothing to prevent sledding, she made no mention of its purported failure to charge an entry fee. It

16

was not until Cleveland's answer that this point emerged. On appeal, Tucker Muir argues that the district court erred by accepting the fact that Cleveland did not charge admission.

Cleveland takes the position that charging admission would inherently require a screening or control process for admitting those who paid and excluding those who did not. It notes that Tucker Muir's amended petition alleged that Cleveland did nothing to prevent anyone from sledding. When admitting this fact in its answer, it attached the additional point that it did not condition or limit permission to sled on the payment of a fee because that would mean prohibiting at least some from engaging in the activity, a practice that would be inconsistent with doing nothing to prevent or impede sledding activities. Accordingly, by fully admitting the allegation in Tucker Muir's petition, Cleveland acknowledged opening the Sledding Hill to the public free of charge as required for immunity by K.S.A. 58-3204.

D. *Parking and walking*

Tucker Muir's final point under this issue arises out of the district court's acceptance of fact No. 8 when granting Cleveland's request for summary judgment. Here again, the parts which are disputed are not material and the parts which are material are not disputed.

Cleveland's summary judgment motion contains the following assertion: "After parking at the bottom of the hill and walking to the top, Plaintiff and her friend . . . both sat on an inflatable inner tube sled and rode it down the Sledding Hill, where the tube sled struck a fire hydrant." Tucker Muir countered that the fact was controverted and that Cleveland's claim regarding where she and her friend parked and walked was not supported by her GoPro video.

Taking Tucker Muir's points in reverse order, the district court did not err by accepting that she and her friend rode an inflatable sled until it collided with a fire hydrant. This fact was clearly established by the GoPro video Tucker Muir personally curated as they descended the hill. Admittedly, that video does not also illuminate where she parked her vehicle or the precise route they opted for when scaling the hill. In that sense, Tucker Muir was moderately forthcoming when she informed the district court that the GoPro video did "not reflect the specific facts set forth herein." Nevertheless, the video captured the primary fact—that Tucker Muir and her friend rode a sled down the hill and hit a fire hydrant. Thus, the video supports the materiality aspect of Cleveland's purported fact.

Tucker Muir's contention about parking and walking up the hill is more difficult to tease out. In her amended petition, she stated that her vehicle was parked along 108th Terrace, which is at the bottom of the hill. In depositions, Tucker Muir testified that she and her daughter walked up the hill and did not see any warning signs. She also explained that she met her friend at the top of the hill.

But Cleveland, in moving for summary judgment, conveyed this information in the following manner: "After parking at the bottom of the hill and walking to the top, Plaintiff and her friend . . . both sat on an inflatable inner tube sled." The grammatical structure of the sentence could allow a reader to conclude that Tucker Muir and her friend parked together at the bottom of the hill and then walked to the top together. This sentence gives the reader an incorrect impression of the facts. Even so, it cannot be said that this issue prompted the district court to impermissibly resolve a disputed material fact in Cleveland's favor.

While Cleveland's representation of fact did not match that of Tucker Muir, that simply renders the fact 'disputed,' it says nothing of its materiality or lack thereof. Again, both factors must be satisfied. A disputed fact is immaterial if, however resolved, the

18

finding could not affect the judgment. *ONEOK*, 296 Kan. at 934. The location of her friend's vehicle and her path to the top of the hill are facts that fall in this category. In neither instance did the district court resolve a disputed material fact.

In total, the district court did not err in determining the facts available for review on summary judgment. On some points, Tucker Muir successfully pleaded and proved the facts alleged in her amended petition and the district court properly accepted these facts on summary judgment. For those instances where Tucker Muir complains about a dispute of the facts, she confronts the barrier erected as a result of their lack of materiality. That is, none of them could have an impact on the judgment. We have carefully scrutinized this issue and detected no indication the district court improperly resolved disputed material facts against Tucker Muir.

In closing out this issue, Tucker Muir contends that even if the RUS is applicable from the perspective that Cleveland opened the Sledding Hill to the public, it is precluded from claiming immunity from liability because it willfully or maliciously failed to guard or warn against a dangerous condition. She asserts that the district court improperly defined willful conduct and had the appropriate definition been employed, the record would substantiate her claim that Cleveland acted willfully. Cleveland argues that no genuine issue of material fact exists on the issue of willful conduct.

The RUS protects landowners from liability except in cases of "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." K.S.A. 58-3206(a). The district court determined that this exception did not apply. Tucker Muir and Cleveland both discuss the district court's reliance on *Klepper* to resolve this issue.

Following Klepper's loss in a jury trial against Milford and in his bench trial against the United States, he filed a consolidated appeal to the Tenth Circuit and argued

19

that the judge used an incorrect standard of willfulness when instructing the jury and when making findings at the bench trial.

Klepper argued that willful did not imply an intention to cause injury. Rather, it was limited to acts carrying a high degree of negligence. The *Klepper* court clarified that the proper definition of willfulness was "intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur." 825 F.2d at 1446. Tucker Muir asserts that this definition from a federal court is at odds with binding precedent from our Supreme Court.

Tucker Muir pushes for the definition of willfully articulated in *Mathes v. Robinson*, 205 Kan. 402, 469 P.2d 259 (1970). There are two reasons we are not inclined to adopt her position. First, the *Mathes* court was not solely defining willful; its definition was an amalgamation of concepts from both willful *and* wanton conduct. Second, the definition promulgated by the *Mathes* court appears to be tailored in some respects to the specifics of that case, which may explain why it never achieved mainstream status.

The *Mathes* court's efforts yielded the following definition:

> "It is fundamental that the law is regardful of human life and personal safety, and if one is grossly and wantonly reckless in exposing others to danger, it holds him to have intended the natural consequences of his acts or omissions, and treats him as guilty of willful and wanton wrong. Our cases hold that one with knowledge of existing conditions, and conscious from such knowledge that injury or death will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously does some act, or omits to discharge some duty, which produces the injurious result, is sufficient to establish willful or wanton conduct." 205 Kan. at 405.

It is not entirely clear which of the two terms the *Mathes* court was endeavoring to define, conduct which is willful or wanton or both. Consequently, Tucker Muir's citation

to *Mathes* does not advance her position and stands as the first reason why her reliance on it is misguided.

The second reason relates to our Supreme Court's treatment of *Mathes* since the opinion was issued. Two years after its issuance, our Supreme Court repeated the ambiguity that plagued *Mathes*' definition as it discussed "willful or wanton act[s]" in *Weber v. Southwestern Bell Telephone Co.*, 209 Kan. 273, 285, 497 P.2d 118 (1972). That seemingly marks the final discussion on the matter.

The *Klepper* court noticed that *Mathes* was dormant for over 10 years when it noted that "the language of *Mathes* is something of an anomaly and has not been used in a string of recent Kansas tort cases that continue to distinguish between willful and wanton or reckless conduct." *Klepper*, 825 F.2d at 1447. But our Supreme Court has not referred to the *Mathes* definition for willful and/or wanton since 1998. See *Reeves v. Carlson*, 266 Kan. 310, 314, 969 P.2d 252 (1998).

Meanwhile, our Supreme Court did fashion a competing definition of willful which emerged as the standard for jury trials. When granting summary judgment for Cleveland, the district court correctly pointed to this definition by citing *Klepper* and noting that *Klepper* cited *Anderson, Administrator v. White*, 210 Kan. 18, 499 P.2d 1056 (1972). The Anderson court drew the following distinction between willful and wanton conduct:

"Willful conduct is action indicating a design, purpose or intent on the part of a person to do wrong or to cause an injury to another. The record is devoid of evidence to show either defendant intended to injure Mrs. White's mother.

"Wanton conduct is action indicating a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the action. There is not sufficient evidence of 'complete indifference' on

21

the part of Mr. White to show wanton misconduct on his part. [Citation omitted.]" 210 Kan. at 19-20.

Our Supreme Court's reasoning in *Anderson* provides an aid for understanding the kind of evidence necessary to establish willful versus wanton conduct. PIK Civ. 4th 103.04 (2012 Supp.), provides the following definition: "Willful conduct is intentionally or purposefully doing wrong or causing injury to another." *Anderson* stands as the authority contained within the Notes on Use section for that instruction which the district court cited when rendering its summary judgment decision. The Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022). PIK instructions should generally be the starting point when preparing any set of jury instructions. 316 Kan. at 353.

Tucker Muir counters that this variation of "willful" was not the operative definition when our Legislature enacted K.S.A. 58-3206. *Klepper*, 825 F.2d at 1446 n.9 ("When the Kansas RUS was enacted in 1965, the definition of willful contained in PIK, Civil, was 'willful conduct is conduct that is purposeful and intentional and not accidental.'"). But if the district court denied summary judgment and sent the case to a jury, the appropriate instruction would be the current PIK. The district court correctly approached the task of deciding summary judgment from the perspective of deciding whether genuine fact issues remained for a jury to resolve. With that framework in mind, consultation of the instructions which the jury would receive is appropriate.

The district court did not err in its construction of the word willful as it relied on the current definition and drew guidance from cases in which it had been applied. The judge accurately apprised the record when it found that "none of the evidence available to the Court suggests that the Cleveland Defendants intended to injure the Plaintiff or had a designed purpose to do wrong or cause injury to the Plaintiff on January 2, 2021." The

22

evidence available in the record on appeal substantiates that conclusion. The district court properly concluded that the willful or malicious exception to recreational use immunity was not applicable in this case.

III. *Did the district court properly decline to find that Tucker Muir was a trespasser at the time of her accident?*

Tucker Muir's final contention of error consists of the claim that she was properly classified as a trespasser on the day in question and that the district court erred when it prohibited her from advancing that argument. Cleveland argues that Tucker Muir's factual assertions combine with its own admissions in the pleadings to become judicial admissions that conclusively bind the parties. It further asserts that once the plaintiff alleges a fact and the defendant admits that fact, then the fact is no longer in dispute. Although its nomenclature of judicial admissions is wrong, the district court correctly granted summary judgment.

The district court struggled to find the proper vocabulary to characterize Tucker Muir's factual assertions in litigation but ultimately arrived at the right answer. The confusion here is that the caselaw which the district court reviewed involved defendants attempting to withdraw their own judicial admissions. That is not what happened here. Here, the *plaintiff* attempted to withdraw the facts that the *defendant* admitted. A slavish and pedantic obsession with precise verbiage is unnecessary here. Suffice it to say, Tucker Muir successfully pleaded and proved that she was not a trespasser, and the district court correctly found that Tucker Muir was not a trespasser.

In Tucker Muir's amended petition, she alleged that Cleveland permitted the public to use the Sledding Hill, and she was part of that public accessing the Sledding Hill. The facts which she pleaded and, later proved in the discovery process consisted of the following: "Defendants implicitly (if not explicitly) *consented* to individuals entering

23

onto its Property for the purpose of sledding on the Sledding Hill"; "Plaintiff went sledding with her daughter and family friends at the Sledding Hill"; "When she arrived at the hill, Plaintiff witnessed dozens, if not a hundred, members of the public sledding down the hill"; and "Defendants allowed persons to enter or remain on Defendants' premises without exercising ordinary and reasonable care to make the dangerous condition of the premises thereof reasonably safe."

Tucker Muir then argued that Cleveland's property was closed to the public and she was a trespasser. The district court, when granting summary judgment for Cleveland, stated: "Plaintiff's legal status as someone permitted to use the Sledding Hill in order to sled has been judicially admitted and Plaintiff is now estopped from claiming otherwise." Tucker Muir takes issue with the district court's use of the phrase "judicially admitted" and the word "estopped." The district court cited several cases for its ruling and Tucker Muir attacks the applicability or persuasiveness of those cases. She is correct that the district court selected the wrong terminology for its ruling.

A "judicial admission" is a "formal waiver of proof that relieves an opposing party from having to prove the admitted fact and bars the party who made the admission from disputing it." Black's Law Dictionary 58 (12th ed. 2024). The district court's error is a rather reasonable one as it seems to stem from the unusual flow of litigation in this case that jumbled which party was the opposing party, which party made the admission, and which party was disputing the admitted fact.

First, the district court pointed to *Farha v. City of Wichita*, 284 Kan. 507, 511, 161 P.3d 717 (2007), but that case does not resolve the issue of judicial admissions. The court next turned to *Ferguson v. Southwestern Life Ins. Co.*, CIV. A. No. 87-2432-0, 1989 WL 7895 (D. Kan. 1989). *Ferguson* involved the enforceability of the suicide clauses contained in the defendants' life insurance policies. The plaintiff alleged coverage by insurance policies and the amount of their coverage. The defendants apparently admitted

24

the same because at pretrial "there was no issue regarding the policies' existence or face amount." 1989 WL 7895, at \*3. The plaintiff failed to introduce the insurance policies into evidence, but the policies were not in dispute. Then the defendants moved for judgment in their favor because the policies were not in evidence. The *Ferguson* court held that manifest injustice would result from entering judgment for defendants because the defendants admitted a fact, relieved the plaintiff of the burden of proving the fact, and then later contested the fact for lack of evidence. 1989 WL 7895, at \*3. In short, defendants cannot admit a fact, only for those same defendants to later retract that admission.

Similarly, the Tenth Circuit did not allow defendants to admit a fact and then retract the defense admission in *Kansas City Life Ins. Co. v. Bowns*, 129 F.2d 287 (10th Cir. 1942). As in *Ferguson*, the litigation revolved around a life insurance policy. The plaintiff alleged death from bodily injury effected by external, violent, and accidental means. The defendant insurance company admitted that the death resulted from external and violent means, relieving the plaintiff of the burden of proof. But then the defendant sought to introduce testimony showing suicide. The district court excluded that testimony, and the *Bowns* court affirmed. 129 F.2d at 287-88. Again, once a defendant made an admission, the defendant was not permitted to withdraw its admission.

Finally, the district court cited a case which seems to be the source of confusion for the parties: *Grynberg v. Bar S Services, Inc.*, 527 Fed. Appx. 736 (10th Cir. 2013). Jack J. Grynberg contracted with Bar S to move an oil and gas drilling rig. After the logistics went awry, Grynberg sued Bar S for breach of contract and Bar S filed counterclaims. At the summary judgment stage, Grynberg sought to amend his complaint to drop his breach of contract claim on the grounds that Bar S never signed the contract.

The district court denied his motion to amend his complaint because he failed to provide any reason why he was unaware that Bar S had not signed the contract. Further,

25

and most importantly for the present analysis, Grynberg never sought leave to amend his answer as a counterclaim defendant. The district court found "no reason for the Court to allow Grynberg to change its theory of the case at this late date." 527 Fed. Appx. at 739.

The *Grynberg* court affirmed. "There was no factual dispute on this claim because Mr. Grynberg affirmatively asserted that there was a contract in his complaint and admitted to an even more detailed allegation about the contract in his answer to the counterclaim complaint." 527 Fed. Appx. at 739-40. The *Grynberg* court continued to lump together Grynberg's *allegations* as a plaintiff with his *admissions* as a counterclaim defendant. "If Mr. Grynberg wanted to avoid the consequences of his judicial admissions, he needed to move for leave to amend his answer to Bar S's counterclaim, and he needed to appeal the district court's denial of his motion to amend his complaint. He did neither of those things." 527 Fed. Appx. at 740. In *Grynberg*, the rule is somewhat muddied by the fact that, because of claims and counterclaims, both parties acted as plaintiffs and defendants. But the cases cited by the district court correctly show that once a defendant (or counterclaim defendant) makes a judicial admission, then that defendant is bound by the admission.

Plaintiff allegations are not admissions. *Jones v. Tanks Plus*, No. 108,029, 2013 WL 678368, at *6 (Kan. App. 2013) (unpublished opinion). Steve Jones fell when the catwalk collapsed off of a saltwater storage tank. Litigation involved several entities. When Jones opposed one party's summary judgment motion, the *Jones* court needed to determine whether the allegations in Jones' petition prevented him from changing his position on the relationships between the other various defendants.

The *Jones* court pointed to caselaw in which defendants had described their own legal status. 2013 WL 678368, at *6. A defendant could not exclude his own statement about the value of his own real property. *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 802, 112 P.3d 125 (2005). Defendants who alleged they were business partners in

26

litigation could not argue that they were not business partners in subsequent litigation. *Every v. Rains*, 84 Kan. 560, 564-65, 115 P. 114 (1911). But Jones was a plaintiff alleging relationships between defendants. The *Jones* court permitted him to change his position. Jones was not locked into the allegations he made in his petition. Unlike this case, the *Jones* court was not confronted with the question of whether Jones could retract the defendants' judicial admissions.

Tucker Muir is thus correct that judicial admission is the incorrect term for preventing her from changing positions while litigating summary judgment. The asserted facts in her petition are allegations, not admissions, and therefore cannot be judicial admissions binding on the parties. But Tucker Muir cannot force Cleveland to withdraw its admissions either.

The district court also used the word "estopped," which Tucker Muir takes issue with in her brief and her reply brief. But she provides no legal analysis to aid this court in determining what her difficulty is with the term. Helpfully, *Jones* also discussed the doctrine of judicial estoppel. The *Jones* court quoted the United States Supreme Court, and provided a description which is equally useful here:

> "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 742-43, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001).

The doctrine of judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" 532 U.S. at 749.

The *Jones* court held that Jones was not barred from changing his assertions by judicial estoppel. Jones alleged unproven contentions in his petition about the relationship between defendant business entities and received no benefit from the allegations, which is why the *Jones* court contrasted the case with *Marley v. M. Bruenger & Co., Inc.*, 27 Kan. App. 2d 501, 6 P.3d 421 (2000). In *Marley*, an injured truck driver received roughly $40,000 in benefits based on his insurance policy identifying him as an independent contractor. Then, he filed a workers compensation claim against the respondent, claiming to be their employee. The *Marley* court held that he had previously taken advantage of his representation that he was an independent contractor and was estopped from claiming to be an employee. 27 Kan. App. 2d at 505-06.

The district court's use of the term judicial estoppel is therefore imprecise. Tucker Muir did not induce the court to act in a certain way and then take a contrary or conflicting position in a related proceeding involving the same opposing parties. See *Jones*, 2013 WL 678368, at *7 (quoting *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 263, 261 P.3d 943 [2011]). But we see this error as a nonissue. Even though the district court erred in applying judicial estoppel, the error did not matter because the district court still addressed the merits of the parties' claims and objections. If a district court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision. *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015). Here, the district court adequately addressed the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits before granting summary judgment.

On a final note, Tucker Muir argues that she presented two theories of the case: that Cleveland was open to the public and, alternatively, that Cleveland was closed to the public and she was a trespasser. She asserts that the district court erred by confining her to one theory of the case.

28

Elements of her briefing on this point are incongruent with each other. That is, Tucker Muir admits that she failed to allege in her petition that she was a trespasser: "The District Court erroneously found the *lack of an allegation* in Ms. Tucker Muir's Amended Petition that she was a trespasser to be *a judicial admission* that Ms. Tucker Muir was not a trespasser." (Emphases added.) This statement clearly concedes that Tucker Muir failed to allege in her amended petition that she was a trespasser. But later in her briefing, Tucker Muir argues that the district court erred by not allowing her to claim trespasser status, "particularly when Ms. Tucker Muir had included an allegation in her Amended Petition about the standard that applies to trespassers." "Here, Plaintiff made alternative allegations which are not judicial admissions, and the Court erred in finding to the contrary."

While it is not entirely clear from Tucker Muir's briefing whether she did or did not allege that she was a trespasser in her amended petition, it is clear from that actual amended petition. Tucker Muir alleged that Cleveland opened the Sledding Hill to the public and she was part of that public. She clearly stated that Cleveland allowed persons to enter or remain on the Sledding Hill without exercising ordinary and reasonable care to ensure the public's safety.

On appeal, she plucks the words "recklessly" and "wantonly" from their context and argues that their use in her petition amounts to alleging trespasser status. She asserts that these words are not legally operative terms under the RUS and they only relate to a party's status as a trespasser. It is true that the words recklessly and wantonly appear in Kansas caselaw on trespassers. See, e.g., *Wrinkle v. Norman*, 297 Kan. 420, 422, 301 P.3d 312 (2013). And it is true that Tucker Muir used these words in her petition. But the context of the petition is perfectly clear. Tucker Muir alleged repeatedly that Cleveland opened its grounds and took no actions to remove the public.

Tucker Muir successfully pleaded and proved that Cleveland allowed her to be on the Sledding Hill, inherently refuting the status of a trespasser. The district court correctly found the facts as Tucker Muir alleged them, correctly determined that the legal impact of the undisputed material facts made Cleveland immune from liability under the RUS, and correctly granted summary judgment for Cleveland.

Affirmed.